**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MARCUS T. STATEN, | ) | CASE NO. 3:25-CV-2129 |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK<br>UNITED STATES DISTRICT JUDGE |
| v. | ) | MAGISTRATE JUDGE<br>JENNIFER DOWDELL ARMSTRONG |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Marcus T. Staten's application for a period of disability, Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Mr. Staten seeks judicial review of that decision, as it relates to SSI,[1] pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Oct. 6, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

In August 2023, Mr. Staten applied to the Social Security Administration (SSA) seeking DIB and SSI benefits; he initially claimed that he became disabled on May 20, 2019, but the alleged onset date was amended to July 27, 2023. (Tr. 188, 192, 42–43.)[2] He identified five

[1] The Agency determined that Mr. Staten did not qualify for DIB because he had not worked long enough to qualify for those benefits. (Tr. 86.) Mr. Staten limits his arguments in this appeal to the denial of his application for SSI.

[2] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 568"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 580").

allegedly disabling conditions: (1) post-traumatic stress disorder; (2) bipolar disorder; (3) unspecified mood disorder; (4) "substance addiction disorder"; and (5) depression. (Tr. 226.)

The SSA denied Mr. Staten's application initially and upon reconsideration. (Tr. 68, 76, 84, 85.) Mr. Staten requested a hearing before an administrative law judge (ALJ). (Tr. 107.) Mr. Staten's counsel submitted a brief in advance of the hearing. (Tr. 295–98.) The ALJ held a hearing on August 1, 2024, at which Mr. Staten was represented by counsel. (Tr. 37–67.) Mr. Staten testified, as did an independent vocational expert (VE). (*Id.*)

On September 17, 2024, the ALJ issued a written decision finding that Mr. Staten was not disabled. (Tr. 12–32.) Mr. Staten requested review of the ALJ's decision, and his counsel submitted a brief identifying alleged errors in that decision. (Tr. 183, 299–302.)

On August 8, 2025, the Appeals Council denied review. (Tr. 1.)

On October 6, 2025, Mr. Staten filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Staten asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ failed to comply with the Sixth Circuit's policy on res judicata.
>
> **Second Assignment of Error:** The ALJ's RFC finding is unsupported by substantial evidence. The ALJ failed to evaluate the medical opinion of Andria Doyle, Ph.D. pursuant to the revised regulations.

(Pl.'s Merit Br. at 12, 15, ECF No. 8, PageID# 580, 583.)

## III. BACKGROUND

### A. <u>Previous Applications for Social Security Benefits</u>

Mr. Staten previously applied for SSI benefits, alleging disability beginning on May 20, 2019. (*See* Tr. 69.) While the records from that application are not in the record before the Court, it appears that the claim was approved at the initial level beginning on July 24, 2019. (*See id.*; *see*

*also* Tr. 231.) The Commissioner explains in his brief that the Agency would have terminated Mr. Staten's eligibility for SSI payments after he was incarcerated for longer than a year, requiring him to reapply for benefits, if he wished, upon release. (*See* Comm'r Br. at 2–3, ECF No. 9, PageID# 593–94.)

### B. Personal, Educational, and Vocational Experience

Mr. Staten was born in May 1980 and was 43 years old on the date of his application. (Tr. 188, 192.) He completed the eighth grade but has not graduated from high school. (Tr. 44, 227.) He has some remote work history as a fast food cook and a lawn care worker, and more recently he worked for a short while as a sanitation worker and as a packager through a staffing agency. (*See* Tr. 227.) He has not worked since 2018. (*Id.*) He was recently incarcerated on state convictions for a little over three years, being released on August 27, 2023. (*See* Tr. 344–45, 458.) He reported to his providers that he has been incarcerated for 22 years total in his lifetime. (*See id.*) He has been unhoused since around August 2023. (Tr. 45, 254.) He did not have a driver's license as of August 2024. (Tr. 44.)

### C. Function Reports

Mr. Staten completed a function report in support of his disability application. (Tr. 234–42.) The form is not dated. In the form, Mr. Staten reported that his conditions "slow[] [him] down." (Tr. 234.)

He is able to go out alone, but he does not drive due to "fines." (Tr. 236.) He goes outside twice a day, and when he travels he does so on foot or riding in a car. (*Id.*) He shops once or twice a year for clothes and shoes, and shopping takes him all day. (*Id.*) His spouse helps with paying bills, handling a checking or savings account, and handling other financial tasks. (*See id.*)

He enjoys playing games and watching television, but he only does so about every other day because he no longer has the patience or energy to more frequently engage in these hobbies.

(Tr. 237.) Every "once [in a] blue moon," he socializes with others in person, "laugh[ing] and jok[ing]." (*Id.*) He attends mental health appointments three times per week, but he needs reminders to go and someone goes with him. (*Id.*) He described that he feels he does not "want to be around anymore" and said he was "not the same anymore." (*Id.*)

Mr. Staten takes care of mowing the yard, a task that takes him a few hours. (Tr. 238.) He needs a reminder to take care of this task. (*Id.*) He identified that he spends his time, from the time he wakes up till he goes to bed, "walking around." (Tr. 239.) He is able to see to personal needs like shaving, using the restroom, and feeding himself. (*Id.*) But his ability to dress himself is affected because he "can't think clear," and his ability to bathe is affected by his "mind play[ing] tricks." (*Id.*)

He identified that his conditions cause him limitations in his ability to talk, remember information, concentrate, complete tasks, understand and follow instructions, and get along with others. (Tr. 240.) He described that he is able to pay attention until his "mind blank[s] out." (*Id.*) He does not follow spoken or written instructions well, and he does not get along with authority figures. (*Id.*) He identified that he was fired from a job for problems getting along with authority figures, when those figures used their authority "to[o] much." (*Id.*) He does not handle stress or changes in routine well. (Tr. 241.) He wrote that he had made an appointment to see if he could get back on Medicaid, in order to restart medication. (Tr. 242.)

In December 2023, Mr. Staten wrote to the Agency that his condition has worsened since November 2023, simply describing "worse illness" that "affects [his] everyday life." (Tr. 246, 249.) But he indicated that he was now on medication. (Tr. 246.)

In March 2024, Mr. Staten—with the assistance of counsel—provided additional information. He told the Agency through counsel that he had been released from incarceration in

August 2023 and was unhoused. (Tr. 254.) He said that his mental health conditions had continued to deteriorate since his release from prison. (*Id.*) He identified that he had been diagnosed with schizophrenia in February 2024 and now "has auditory hallucinations 24/7." (*Id.*) He also has visual hallucinations at times. (*Id.*) These hallucinations cause him "extreme anxiety," and he cannot focus for very long. (*Id.*) He further described that he has low motivation and sleeps a lot. (Tr. 257.) He isolates himself, "lacks interest and pleasure in activities he once found enjoyable," and lacks motivation to perform hygiene tasks like bathing and changing clothes. (*Id.*)

### D. <u>Relevant Hearing Testimony</u>

#### *1. Mr. Staten's Testimony*

Mr. Staten testified that he had been unhoused for about a year, and he has been staying with friends. (Tr. 45–46.) He does not have a driver's license; he will obtain a ride from a friend when he needs to go somewhere, like to pick up his medicine. (Tr. 45.) He is on Medicaid through a managed care plan. (*Id.*) He receives food stamps and is able to shop for groceries, although more often someone else will shop for him. (*See* Tr. 54.)

Mr. Staten helps with some basic household chores, like sweeping. (Tr. 46–47.) But his friends do his laundry and cook his meals for him. (Tr. 47.) He remains able to prepare simple meals, like making a sandwich or making a microwave meal or a bowl of cereal. (*Id.*)

Mr. Staten testified that he is not "in [his] right mind" and does not like to be around other people. (Tr. 48.) He will sometimes watch television, but more often he is "sitting back just zoned out." (*See id.*) He has two or three friends that he will sit with and talk to, but otherwise he is "antisocial." (Tr. 49.)

Mr. Staten testified that he hallucinates, "see[s] things," and gets "lost seeing the thing" every day. (Tr. 53.) He described that he sees and talks to "little green men." (*Id.*) He has been friends with one of these men for 20 years. (Tr. 54.)

Mr. Staten receives a monthly injection of aripiprazole, but he is not currently seeing a counselor. (Tr. 49–50.) He takes three other medications, but one of his doses was recently lowered because it was causing him to become too drowsy. (Tr. 52–53.) He has no trouble interacting with others in the doctor's office, but he has "no patience" and hates waiting. (Tr. 55.) He has never sought emergency treatment, or treatment at an urgent care center, for his mental health conditions. (Tr. 57.) He consulted with the National Alliance on Mental Illness (NAMI), and their staff helped him fill out some paperwork when he has been denied for benefits. (*See* Tr. 57–59.)

He last used marijuana a month before the hearing, and he last used ecstasy around nine months before. (Tr. 50–51.) He described himself as "clean right now." (Tr. 50.) He denied a substance abuse problem, but he said he smokes marijuana "every now and then." (Tr. 52.)

***2. Vocational Expert's Testimony***

Jacquelyn Wenkman testified as a vocational expert (VE) at the hearing. (Tr. 38.)

The ALJ asked the VE to assume that a hypothetical individual with Mr. Staten's age and education had no exertional limitations but had a number of non-exertional limitations. (Tr. 63.) Specifically, the individual can engage in simple tasks, but not at a production rate pace like that required working on an assembly line. (*Id.*) They can make judgments on simple work and respond "appropriately to usual or situations where duties are generally stable, predictable and short-cycle." (*Id.*) They can adapt to occasional changes in a routine work setting that are explained in advance and implemented such that the individual can adjust their performance to meet new task criteria or requirements. (*Id.*) They cannot perform work that requires a daily production quota, such as piece work. (*Id.*) But they can perform goal oriented work and meet end of day production requirements. (*Id.*) They cannot interact with the general public, but they can have occasional interaction with supervisors and coworkers. (*Id.*) With coworkers, the person cannot engage in team or tandem

tasks. (*Id.*) Further, the person's interactions with coworkers should be superficial, which the ALJ defined as "the ability to exchange greetings and engage in casual conversation, [a]lthough work-related interactions should be of short duration for a specific purpose such as work-related exchanges." (*Id.*)

The VE testified that such a person could perform the work of a hand packer (DOT 920.587-018), kitchen helper (DOT 318.687-010), or assembler (DOT 709.684-014). (Tr. 64.)

The VE further testified that employees get three breaks in an eight-hour workday, two breaks of 10 to 20 minutes and a meal break of 30 to 46 minutes. (*Id.*) Employers will tolerate employees who are off task less than 15 percent of the workday. (*Id.*) And employees usually get three to six absences in the first year of employment, so one absence per month would probably be work-preclusive after three to six months. (*Id.*)

Mr. Staten's counsel asked the VE to assume that the hypothetical individual would be further limited in that they needed to work in isolation. (Tr. 65.) The VE testified that, for unskilled work, that would be work-preclusive. (*Id.*)

**E. <u>State Agency Consultants</u>**

A disability examiner (Christopher Hart) and a psychologist (Jennifer Swain) reviewed Mr. Staten's claim at the initial review level in November 2023. (Tr. 68–76.)

Dr. Swain opined that Mr. Staten had moderate impairments in his ability to understand, remember, and apply information; to interact with others; to concentrate, persist, and maintain pace; and to adapt and manage himself. (Tr. 71.) Dr. Swain further opined that Mr. Staten's allegations about his symptom related limitations were not consistent with record. (Tr. 72.) Dr. Swain explained that he "appeared to lack credibility," as he "was extremely symptomatic at the time of the consultative examination" but his "presentation is not consistent with other records in

file." (*Id.*) Dr. Swain opined that the consultative examiner's opinion that he was not credible was "consistent and persuasive." (Tr. 73.)

Dr. Swain concluded that Mr. Staten retained the ability to understand, remember, and carry out "simple 1-2 step instructions." (Tr. 73.) He can concentrate, persist, and maintain pace "to carry out a learned routine in a structured and predictable work setting." (Tr. 74.) He should be limited to "brief superficial interactions in non-public work settings." (*Id.*) And he can adapt and manage himself "in a structured and predictable work setting, where changes can be easily explained." (*Id.*)

In explaining her opinions, Dr. Swain pointed to prison records that showed his treatment for depression was discontinued before his release when he was reportedly doing well, and she noted that he had no current mental health treatment, with medical records showing no reports of depression or other significant health issues. (Tr. 75.)

Based on these opinions, the consultants concluded that Mr. Staten could perform the work of a marker, order caller, or mail clerk, and was not disabled. (Tr. 76.)

In a letter to Mr. Staten explaining this decision, the Agency wrote that the records showed that he remained able to think, communicate, and care for his own needs despite his conditions. (Tr. 94.)

At the reconsideration level, these findings were reviewed by a different disability examiner (Mary Sleeth) and psychologist (Joel Forgus, Ph.D.) in January 2024. (Tr. 77–85.) Dr. Forgus opined that the initial level findings were persuasive, as they were supported by the objective evidence and consistent with the medical records. (Tr. 80.) Dr. Forgus explained that the record showed that Mr. Staten's symptoms "are adequately controlled with abstinence and treatment compliance." (*Id.*) Dr. Forgus further wrote that the "preponderance of evidence

indicates that [Mr. Staten] may be somewhat restricted by symptoms but would not be wholly compromised in his ability to function in a work setting." (*Id.*)

Dr. Forgus largely agreed with the initial level residual functional capacity, although he found a marked (as opposed to moderate) limitation with respect Mr. Staten's ability to interact appropriately with the general public. (Tr. 82.) Dr. Forgus opined that Mr. Staten could "understand and remember only simple instructions." (*Id.*) Mr. Staten "can perform simple repetitive tasks without strict production standards" and "can focus on simple tasks for 2-hour periods with routine breaks . . . throughout a regular workweek." (*Id.*) Dr. Forgus stated that Mr. Staten has "limited social tolerance, but he can relate appropriately in settings with reduced social demands that require only a) occasional interactions with coworkers/peers; b) no contact with the public; and c) supervision that is simple, direct, and concrete." (*Id.*) Mr. Staten would be "able to adjust to routine changes and to manage his emotions and symptoms within a routine work setting." (Tr. 83.)

Based on these opinions, the consultants agreed with the initial level findings that Mr. Staten could perform the work of a marker, order caller, or mail clerk and was not disabled. (Tr. 84.)

In a letter to Mr. Staten explaining this decision, the Agency wrote that it had determined that his conditions were "not severe enough to keep [him] from working." (Tr. 100.)

### F. Relevant Medical Evidence[3]

Before the alleged onset of disability, Mr. Staten consulted with Shaiem Hampton, LPC, on May 10, 2017. (Tr. 306.) Mr. Staten reported concerns of PTSD stemming from events throughout his life, including "through 15 years of incarceration." (*Id.*) He reported having bipolar

[3] As Mr. Staten's assignments of error relate solely to his mental health impairments and related limitations, I focus my summary only on the evidence relevant to those conditions. Mr. Staten has received some one-off treatment for physical concerns over the years, including for some more significant dental issues, but those treatment records are not at issue here. (*See, e.g.*, Tr. 351, 354–55, 367, 372, 385, 393, 402, 428.)

symptoms as well, since childhood. (*Id.*) He complained of hypervigilance, dissociation, anxious concerns related to avoidance of people and places that trigger thoughts of past trauma, nightmares, and anxious intrusive thoughts. (*Id.*) He reported manic behavior like inability to sleep, hyperactivity, inability to complete tasks, racing thoughts, pressured speech, extreme mood swings, and excessive energy "which can become volatile." (*Id.*) He said his symptoms hinder his ability to maintain jobs and keep close relationships with others. (*Id.*) He did not report suicidal or homicidal ideation. (Tr. 306–07.) The initial diagnostic impression was PTSD and bipolar I disorder, and Mr. Staten was referred for individual counseling and a psychiatric evaluation. (Tr. 310.)

On November 21, 2017, Mr. Staten treated with Gregory Bishop, M.D. (Tr. 304–05.) It was noted that Mr. Staten had been admitted to a psychiatric hospital in September 2017 after he "attempted to commit suicide by strangling himself" while in jail custody. (Tr. 304.) Dr. Bishop found it "interesting" that Mr. Staten was treated for an adjustment disorder with supportive therapy but with no psychotropics, before being released back to jail custody and ultimately being released from custody. (*Id.*) Mr. Staten reported being unhoused and under "quite a bit of stress"; he was not living with his wife or their child. (*Id.*) He denied hallucinations and present suicidal ideation. (*Id.*) Mr. Staten reported a history of elevated moods and racing thoughts, but said that more recently he had been depressed. (*Id.*) He also continued to report anxiety and symptoms like hypervigilance, dissociation, avoidance of people, and nightmares. (*Id.*)

On examination, Mr. Staten was somewhat irritable and guarded, making poor eye contact. (Tr. 305.) His affect was depressed and somewhat anxious. (*Id.*) His insight, judgment, and behavior control were fair. (*Id.*) Dr. Bishop assessed a likely diagnosis of bipolar disorder, "currently in a mixed state," but he could not rule out "underlying paranoia and psychotic

symptoms," although "these do not seem prominent at the present time." (Tr. 306.) He also noted "an anxiety state which could be described either as generalized anxiety disorder or possibly post-traumatic stress disorder." (*Id.*) Dr. Bishop prescribed quetiapine to treat mood lability, and Mr. Staten was to follow up in one or two months. (*Id.*)

There is no further treatment record for mental health concerns until 2022, during Mr. Staten's incarceration.

An October 19, 2022 institutional mental health treatment note reflects that Mr. Staten's primary diagnosis, as recorded by the institution, was persistent depressive disorder. (Tr. 421.) He had not been treated with antipsychotic medication in the last two years for a period of a month or longer. (*Id.*) At the appointment, Mr. Staten reported that he was "getting more good days" and was "making it," noting that his remaining time in custody was "getting short." (Tr. 423.) His mood was euthymic and his demeanor was pleasant. (*Id.*) He expressed a desire to "get back into a parenting role" for his spouse and their children, "be it through income or caring for the children." (*Id.*) He expressed some frustration at not passing the math portion of some GED pre-testing, but he "processed his emoti[o]ns." (*Id.*) The provider noted that his depressive disorder "appears to be managed well" and that Mr. Staten "[c]ontinues to maintain a positive outlook despite recent disappointments and demonstrates resilience." (*Id.*)

Mr. Staten did not attend a scheduled appointment on November 2, 2022, but he was continued on the same treatment plan because his provider noted that he "has been generally managing his depression appropriately with minimal depressive [symptoms] most days, 6/10 on worst day," and that he stated his belief that he was doing well without medication. (Tr. 419.)

Mr. Staten had his next appointment on January 2, 2023. (Tr. 384.) He reported that he was "doing good" and noted that he was still in the GED program and staying connected to his family

through video visits. (*Id.*) His mood was euthymic, and he was smiling. (*Id.*) His thoughts were linear and "free from delusional content." (*Id.*) His speech was normal, and his judgment and insight were fair. (*Id.*)

At an appointment on February 3, 2023, he again said he was "doing well and planning on [his] release." (Tr. 382.) A mental examination was normal; Mr. Staten was "[p]leasant and cooperative." (*Id.*)

On February 14, 2023, he said he was "doing very well." (Tr. 379.) He "[v]erbalized [the] importance of staying clean" and was "forward thinking," expressing a focus "on taking care of his family." (*Id.*)

Mr. Staten had an appointment with a psychologist on May 24, 2023. (Tr. 347.) His rate of tone was fast, but the note makes clear that Mr. Staten was upbeat and excited. (*See id.*) For instance, the psychologist recorded him saying, "I'm getting out of here! I've made it! I go for walks, I talk to my wife and my kids, I play chess, I know how to handle my symptoms." (*Id.*) (exclamation marks in original). Mr. Staten had arrived a half hour early for the appointment, and expressed that he was "very hopeful and excited because he knows he will be released within six months and wants to go home to his children." (*Id.*) He agreed to be connected to reentry services, and he said he was excited to restart his SSI benefits so that they would be ready upon his release. (*Id.*) He denied visual and auditory hallucinations, and "no evidence of a thought disorder was detected or reported." (*Id.*) The psychologist assessed that Mr. Staten was a "[p]atient with PDD diagnosis [who] appears to be coping w[e]ll with his diagnostic symptoms and is experiencing a boost in mood due to his upcoming release date." (*Id.*)

Mr. Staten was approved for transitional control, with a psychologist opining that he was not on mental health medication and can maintain a 32 hour per week work or school schedule. (Tr. 340.)

Mr. Staten was released from custody on August 27, 2023. (*E.g.*, Tr. 499.)

Mr. Staten underwent a telephone diagnostic screening with a counseling and psychiatry center on October 11, 2023. (Tr. 463.) He reported that he used tobacco, alcohol, and illicit drugs (including but not limited to marijuana) daily or almost daily. (Tr. 464.) He reported symptoms of depression, including feeling "down and out," isolating, feeling angry, and not sleeping. (Tr. 466.) He felt overwhelmed frequently and endorsed confusion, a "fuzzy" mind, and difficulty thinking. (*Id.*) He said he felt hopeless, anxious, and irritable, and said he saw "a lot" in prison that had affected him. (*see id.*) On examination, his speech was normal and his affect was full, although he was angry and had a restless motor activity. (*Id.*) He reported no hallucinations. (*Id.*) His behavior was cooperative, and his insight and judgment were fair. (*Id.*) He expressed hope about treatment, saying, "[A]s long as I can stay in it and do what I need to do[] and get back on my medications." (*Id.*) He reported problems reintegrating into society from incarceration. (Tr. 468.) He was referred for individual therapy, medication services, and a substance use assessment; he declined the substance use assessment, saying he "smokes cannabis daily" and had "no desire to stop." (Tr. 469.)

He underwent a telehealth psychological evaluation with psychologist Andria Doyle, Ph.D., on October 17, 2023, as part of his disability application. (Tr. 439–46.) He reported that he was currently unhoused after being released from prison, having been separated from his marriage for three years. (Tr. 440.) He said he had not completed high school or earned his GED because his "anxiety and [his] mind" made it so he could not go. (*Id.*) He earlier had to repeat the first grade

due to learning difficulties and because he had a hard time paying attention. (*Id.*) He reported school expulsions for disruptive behavior, but he said he usually received average grades. (*Id.*) With respect to employment, Mr. Staten reported that he had been repeatedly terminated. (*Id.*)

Mr. Staten admitted to current alcohol and marijuana use. (*Id.*) He was using "alcohol continuously throughout the day" and was using marijuana daily. (*Id.*) He explained that he was "self-medicating" as he awaited new psychiatric medications. (*See id.*) He said he had been working to arrange psychiatric and counseling care through a local practice since his release, but felt that he had "been met with resistance." (*Id.*)

Mr. Staten described symptoms of depression, including low appetite and decreased energy. (*Id.*) He said he "walk[s] around in a circle all day long." (*Id.*) He endorsed excessive guilt, crying spells, and feelings of worthlessness and hopelessness. (*Id.*) He did not report a history of suicidal behavior. (*Id.*) He also reported "an array of symptoms consistent with mania," including decreased need for sleep, prolonged elated mood, grandiosity, excessive goal directed behavior, and prolonged unbounded energy. (*Id.*) He complained of frequent nightmares of trauma, disturbing memories, flashbacks, and specific avoidance of trauma-related stimuli. (*Id.*) And he reported significant anger outbursts and irritability. (*Id.*) Mr. Staten also told the psychologist that he had "paranoid delusional beliefs regarding people who are 'out to get [him].'" (Tr. 441.) He reported a decrease in his activities and in his self-care. (Tr. 442.)

On examination, Dr. Doyle noted that Mr. Staten arrived several minutes late for the interview. (Tr. 442.) Mr. Staten's eye contact was poor, and he was pacing and vaping marijuana during the appointment (*Id.*) He was "somewhat cooperative" but engaged in a "distracted and agitated/irritable manner." (*Id.*) His speech was pressured, with volubility noted. (*Id.*) Articulation was poor, such that he was difficult to understand considering the rapidity of his speech. (*Id.*) He

"cursed excessively," spoke in a "rambling fashion," and was difficult to redirect. (*Id.*) His thought process was very tangential, and flights of ideas were noted. (*Id.*) There was evidence of delusional thinking. (*Id.*) His mood and affect with dysphoric and irritable, with a constricted affect, and overt signs of mania and emotional lability were noted. (*Id.*) He appeared mildly nervous. (Tr. 443.)

Dr. Doyle noted that "gross deficits were noted during an assessment of [Mr. Staten's] mental status." (Tr. 443.) He was not able to say what day of the week it was, or the date. (*Id.*) When asked what season it was, he replied, "August" (it was October). (*Id.*) He could not repeat three words, spell a five letter word forward and backward, remembered none of three words after a short delay, could not successfully subtract from 100 by sevens even once, and could not repeat a full sentence. (*Id.*) His reasoning appeared poor, and he could not focus. (*Id.*) His insight was poor, and his judgment was poor to fair. (*Id.*)

Dr. Doyle's impression was (1) dipolar I disorder, manic, severe with psychotic features; (2) PTSD; (3) alcohol use disorder, moderate; (4) cannabis use disorder, moderate; (5) cocaine use disorder, in sustained remission; and (6) specific learning disorder with impairment in reading. (*Id.*)

Dr. Doyle provided an opinion as to functional limitations, but before describing them I note that she also provided a "reliability estimate," opining that "[t]he objective historical information obtained from [Mr.] Staten appeared to lack credibility as [he] was extremely symptomatic at the time of the interview." (Tr. 445.)

As for functional limitations, Dr. Doyle wrote that Mr. Staten demonstrated significant impairments in his ability to understanding, remembering, and carrying out instructions during the examination. (Tr. 444.) She noted that his mental status suggested "gross deficits in cognitive functioning," and she wrote that "there may be intellectual impairment." (*Id.*) With respect to his

ability to maintain attention and concentration, and in maintaining persistence and pace, Dr. Doyle wrote that Mr. Staten "struggle[d] considerably to maintain attention" during the interview, and his examination suggested gross deficits in attention. (*Id.*) Dr. Doyle noted that Mr. Staten's limited employment and educational history suggested difficulties in maintaining persistence and pace, and there appeared to be current limitations in his ability to perform simple and multi-step tasks like those involved in his activities of daily living. (*Id.*) With respect to his ability to respond appropriately to others at work, Dr. Doyle wrote that Mr. Staten "related in an irritable and extremely distractible manner" during the evaluation and indicated "significant interactional difficulties and self-isolation." (*Id.*) With respect to his ability to respond appropriately to work pressures, Dr. Doyle opined that Mr. Staten "did report or demonstrate psychological symptoms that would likely interfere with work related stress tolerance abilities," and she noted that "[b]ecause he apparently has received little formal training/psychotherapy in stress management, he may respond quite negatively to perceived pressures at work . . . ." (*Id.*)

Mr. Staten consulted with a provider at the counseling and psychiatry center on October 27, 2023. (Tr. 471.) He reported that he was smoking "weed" and drinking alcohol "all day everyday to stay straight." (Tr. 471.) The clinician noted that it was difficult to obtain his history "due to his restlessness and being under the influence" of marijuana and alcohol. (*Id.*) He had difficulty maintaining focus but was able to answer questions appropriately. (*Id.*) For the first time in this record, he reported auditory and visual hallucinations. (Tr. 472.) He also reported anxiety, mood swings, irritability, aggression, and restlessness. (*Id.*) He was scheduled with a nurse practitioner to establish medication management care. (*Id.*)

Mr. Staten failed to attend the scheduled appointment with the nurse practitioner on November 1, 2023, without explanation. (Tr. 476.)

He consulted with a provider at another behavioral health practice, Eliverta Azizi, PMHNP-BC, on November 6, 2023. (Tr. 456.) His appearance was "bizarre" and "disheveled," and he again reported being unhoused. (Tr. 457–58.) He complained of anxiety and restless, depression with decreased concentration, and mood lability, among other things. (Tr. 455.) He also complained of psychosis, including audio and visual hallucinations, which he described as "long-standing" and aggravated by substance abuse, alcohol abuse, difficulty with work, and financial and relationship issues. (Tr. 455–56.) He admitted to substance abuse beginning when he was released from prison—including abuse of alcohol, marijuana, and ecstasy (which he had used since he was released and last used the day before the appointment)—which the provider wrote was aggravated by access to those substances, alcohol abuse, nonparticipation in therapy, and an enabling support system. (Tr. 456.) Screening tests showed moderately severe depression and severe anxiety. (Tr. 455.)

Mr. Staten reported that he "need[s] meds" and "need[s] a not[e] that [he] can't work." (Tr. 458.) Ms. Azizi recommended cognitive behavioral therapy and chemical counseling to address Mr. Staten's substance abuse, but he declined. (Tr. 457.) She assessed him to have schizoaffective disorder and major depressive disorder. (Tr. 458.) After being advised of the contraindications to combining alcohol, marijuana, and prescription medicine, Mr. Staten was prescribed aripiprazole, lamotrigine, and sertraline. (Tr. 457.) He was to follow up in four weeks. (*Id.*)

The first psychiatry and counseling center called Mr. Staten on November 24, 2023, to follow up after the missed appointment. (Tr. 477.) Mr. Staten answered, but when the caller identified herself, Mr. Staten hung up on her. (*Id.*) He was ultimately discharged from their services. (Tr. 474.)

Mr. Staten followed up with Ms. Azizi on December 18, 2023. (Tr. 452.) He was alert, oriented, and cooperative, but he again presented with an elevated and expansive mood. (Tr. 453.) He was anxious appearing, with impaired judgment and insight, but with no auditory or visual hallucinations. (*Id.*) He was hyperverbal and tangential, and there was a concern about medication compliance because he reported not taking his medication regularly. (Tr. 454.) But he felt the medicine was helping. (*Id.*) He was continued on his medications and started on an injectable aripiprazole and buspirone. (Tr. 453–54.)

Mr. Staten next met with Ms. Azizi on January 19, 2024. (Tr. 496.) He again reported that the medications were helping. (Tr. 498.) He denied hallucinations and paranoia. (*Id.*) He was again hyperverbal and tangential, possibly preoccupied. (*Id.*) He was not sure that he had been completely compliant with his medication. (*Id.*) He was referred to NAMI for further resources, as he reported struggling to adjust after his release from incarceration. (Tr. 497.)

On February 19, 2024, Mr. Staten reported to Ms. Azizi that he had not taken his oral medications for three weeks. (Tr. 494.) He was hyperverbal with flights of ideas. (*Id.*) He reported that NAMI was helping him try to get back on SSI. (*Id.*) He was counseled on medication compliance and the "risks of abrupt discontinuation." (Tr. 493.)

He followed up with Ms. Azizi for his monthly aripiprazole injection on March 25, 2026. (Tr. 489.) He reported medication compliance, and on examination he was pleasant, did not appear preoccupied, was not hyperverbal, and did not display flights of ideas. (Tr. 491.) He denied any side effects, issues, or concerns. (*Id.*) He continued to smoke marijuana daily, with no plan to discontinue. (*Id.*) But he reported for the first time since his release that he was not drinking alcohol. (Tr. 490.)

When he followed up again on April 26, 2024, he was irritable but again was not hyperverbal or displaying flights of ideas. (Tr. 488.) He again reported medication compliance, and he did not appear preoccupied. (*Id.*) He reported that he was still not drinking alcohol. (Tr. 487.)

Mr. Staten followed up with Ms. Azizi on May 24, 2024. (Tr. 482.) He appeared irritable and was "not as talkative today as prior visits." (Tr. 484.) But his cognitive function was intact, he was cooperative with exam, his speech was clear and coherent, and his thought process was logical and goal directed. (Tr. 483.) He reported that he was still not drinking alcohol. (Tr. 483.)

## IV. THE ALJ'S DECISION

The ALJ determined that Mr. Staten had not engaged in substantial gainful activity since July 27, 2023, the application date. (Tr. 17.)

The ALJ next determined that Mr. Staten had severe impairments of "psychological conditions variously described as: schizoaffective disorder/bipolar, anxiety disorder, schizophrenia, and major depressive disorder." (*Id.*)

The ALJ determined that none of Mr. Staten's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18.)

The ALJ determined that Mr. Staten had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with a number of non-exertional limitations. (Tr. 22.) Specifically, he can engage in simple tasks, but not at a production rate pace (like on an assembly line). (*Id.*) "He can make judgments on simple work and respond appropriately to usual work situations where duties are generally stable, predictable, and short cycle and adapt to occasional changes in a routine work setting that are explained in advance and implemented such that he can adjust his performance to meet new task criteria and/or requirements." (*Id.*) He cannot

perform work that requires a daily production quota (like piecework), but can perform goal-oriented work and meet end of day production requirements. (*Id.*) He cannot interact with the general public. (*Id.*) He can have occasional interaction with supervisors and coworkers and with coworkers, he cannot engage in team or tandem tasks. (*Id.*) Further, his interaction with coworkers should be superficial in nature, which the ALJ defined as "the ability to exchange greetings and engage in casual conversation, although work-related interactions should be of short duration and for a specific purpose such as work related exchanges." (*Id.*)

The ALJ found that Mr. Staten had no past relevant work and was 43 years old on the date of his application. (Tr. 30.) He found that Mr. Staten had a limited education. (*Id.*)

The ALJ then determined that—considering Mr. Staten's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "hand packer" (DOT 920.587-018), "kitchen helper" (DOT 318.687-010), and "assembler" (DOT 729.684-014). (Tr. 31.)

Accordingly, the ALJ determined that Mr. Staten is not disabled. (*Id.*)

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. <u>Standard for Disability</u>**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant

must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which

he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

**C. <u>Analysis</u>**

Mr. Staten raises two assignments of error in this appeal, one related to the ALJ's analysis of the record evidence and the other related to what is *not* in the record. I address the latter argument first.

**1. First Assignment of Error – Previous Application and *Res Judicata***

In his first assignment of error, Mr. Staten points out that he was approved for SSI at the initial review level in 2019. Presumably, the argument goes that but for his incarceration he could be receiving SSI to this day based on his first application alone. But he was required to reapply, and the ALJ denied his second application without a passing mention to his previously approved application. Mr. Staten argues in his opening brief that the ALJ's failure to obtain the previous file or to consider the previous decision raised *res judicata* issues and violated the SSA's Acquiescence Rulings 98-4(6) and 24-1(6), as well as the Agency's Program Operations Manual System at HA 01210.013(B)(1). (Pl.'s Merits Br. at 12–15, ECF No. 8, PageID# 580–83.)

The Commissioner defends the Commissioner's decision, pointing out that Mr. Staten's previous application was decided at the initial review level and arguing that AR 24-1(6) and *res judicata* only apply only "if an ALJ or the Appeals Council has issued a final decision." (Comm'r

Merits Br. at 8–9, ECF No. 9, PageID# 599–600.) Therefore, he says, the ALJ was not required to consider Mr. Staten's previous application at all. (*Id.*) And because he was not required to consider the previous application, the argument goes, he was not required to obtain the file. (*Id.*)

In reply, Mr. Staten concedes that the prior decision was not formally binding as a matter of *res judicata*, but he insists that the ALJ "was still required to consider the prior administrative findings and underlying record." (Reply Br. at 1, ECF No. 11, PageID# 607.)

It is true that the record before the Court does not show Mr. Staten's previous medically determinable impairments, or the RFC opined by the state agency consultants years ago. The previous file was not sent to the ALJ in this matter after Mr. Staten was released from incarceration. It is thus not clear the basis for the previous approval for benefits.

I do note, though, that institutional records from Mr. Staten's incarceration contain an entry that Mr. Staten has never received SSI benefits due to mental illness during adulthood. (*See, e.g.*, Tr. 421.)

In any event, the Commissioner is correct that there is no reversible error here.

As an initial matter, it is the claimant's responsibility to provide a complete record, especially in circumstances where, as here, they are represented by counsel. *See, e.g.*, *Watkins v. Astrue*, No. 1:10CV486, 2011 WL 4478487, at *6 (N.D. Ohio Sept. 26, 2011). Here, counsel stated at the hearing that the record was complete. (Tr. 43.) Mr. Staten cannot now complain that the ALJ should have obtained more records from the previous file when the issue was not raised before the ALJ.

Moreover, although HALLEX describes policies that ALJs should follow when conducting hearings and reviewing a claimant's case, HALLEX's procedural guidance is not binding on this Court. *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008); *Workman v. Comm'r*

*of Soc. Sec.*, No. 3:20-CV-01821, 2021 WL 8342810, at *12 (N.D. Ohio Nov. 15, 2021); *Robberts v. Comm'r of Soc. Sec.*, No. 2:18-cv-541, 2019 WL 4023549, at *7 (S.D. Ohio Aug. 26, 2019) ("Importantly, HALLEX is an internal guidance tool that does not have the force of law . . . . Indeed, HALLEX does not impose judicially enforceable duties on either the ALJ or this Court.") Additionally, "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917). The Court should therefore review the ALJ's decision not to obtain additional records only for abuse of discretion. *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) (citing *Halter*, 279 F.3d at 356).

But even if the HALLEX and POMS provisions were binding on this Court, Mr. Staten cannot demonstrate that the ALJ violated these policies. Under POMS HA 01210.013, the hearing office's staff will request a prior file under five circumstances, none of which are applicable here. POMS 01210.013(B(1) (continuing disability review, collateral estoppel due to overlapping time period, possible reopening or *res judicata* issue, application of an Acquiescence Ruling, or fraud).

His arguments regarding *res judicata* fare no better. In *Drummond*, the Sixth Circuit held that principles of *res judicata* apply in the Social Security context, such that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. Thus, "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id.*

In response to *Drummond*, the SSA promulgated Acquiescence Ruling 98-4(6), which provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators

> must adopt such a finding **from the final decision by an ALJ or the Appeals Council** on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling 98-4(6), 1998 WL 283902, at *3 (June 1, 1998) (emphasis added).

In *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit clarified *Drummond*'s scope, but not in a way helpful to Mr. Staten. The court held that, while *Drummond* reached the correct result, it "overstat[ed]" its holding. *Id.* at 933. The court noted that principles of "[f]inality, efficiency, and the consistent treatment of like cases" are important in Social Security proceedings. *Id.* Accordingly, if an individual files a second application covering **the same time period** as the initial application, res judicata applies unless the claimant provides a justification for revisiting the earlier decision. *Id.* (emphasis added). Indeed, by holding that *res judicata* does not apply to a new claim covering a new time period, *Earley* "significantly walked back administrative application" of *Drummond*. *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 WL 1175415, at *3 (N.D. Ohio Mar. 29, 2021).

*Earley* and the caselaw show that *res judicata* apply to decisions of the ALJ or Appeals Council (*i.e.*, not to decisions at the initial level) and it was entirely proper for SSA to give his second application a fresh look, especially because it covered a different time period. "[A] claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994." *Id.* And, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review." *Id.*

While Mr. Staten would have preferred that the ALJ reach a different conclusion on the merits, I see no reversible error in the ALJ's decision not to obtain or refer to the previous file,

especially where Mr. Staten's counsel represented that the record was complete. Therefore, I recommend that the Court overrule Mr. Staten's first assignment of error.

### 2. Second Assignment of Error – Dr. Doyle and the Weight of the Evidence

In his second assignment of error, Mr. Staten contends that the ALJ's RFC was unsupported by substantial evidence and that his consideration of Dr. Doyle's opinion was flawed.

The Commissioner acknowledges that the ALJ incorrectly referred to Andria Doyle, Ph.D., as opinion, referring to it as "D. Andria, Ph.D., and Dr. Andria (Tr. 26, 29, 445)" but he argues that the ALJ adequately addressed both the supportability and consistency factors, and his decision was supported by substantial evidence.

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Mr. Staten's argument relies primarily on Dr. Doyle's assessment and on scattered abnormal examination findings. I find that the ALJ addressed both supportability and consistency.

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Here, I have no trouble concluding that the ALJ addressed supportability and consistency, adequately considered the evidence, and arrived at a decision that is supported by substantial evidence.

First, the ALJ discussed Dr. Doyle's opinion at Step Two, noting that the consulting examination upon which her opinions are based "was conducted prior to the claimant being compliant with medication on an ongoing basis." (Tr. 21.) The ALJ further noted that "once compliant with medication, the claimant's treatment notes indicate that his conditions are mostly stable, and his symptoms significantly decreased." (*Id.*) The ALJ repeated these findings when discussing the RFC. (Tr. 27.)

Then, in specifically discussing Dr. Doyle's opinions later in the decision, the ALJ reasoned as follows:

> Overall, these opinions are not persuasive. While the consultative exam indicates that the claimant has some mental limitations and mental health

> impairments, the severity of the limitations opined by D. Andria, Ph.D., are not supported by the treatment records. For example, once complaint with medication, the claimant's treatment notes indicate that his conditions are mostly stable, and his symptoms significantly decreased. For example, on May 24, 2024, he was well nourished, and in no acute distress. He was alert and oriented x3, his gait was normal, his cognitive function was intact, he denied hallucinations, his speech was clear and coherent, his thought process was logical and goal directed, and he denied suicidal ideations and delusions. Likewise, on April 26, 2024, the claimant reported compliance with medication, he was not hyperverbal, he did not appear preoccupied, he denied suicidal and homicidal ideation, he denied hallucinations, and he denied any medication side effects.
>
> On exam, the claimant was well nourished, and in no acute distress, and he was comfortable and cooperative. He was alert and oriented x3, his gait was normal, his cognitive function was intact, he was cooperative, he denied hallucinations, his insight and judgment were good, his speech was clear and coherent, his thought process was logical and goal directed, and he denied suicidal ideations and delusions

(Tr. 29) (internal record citations omitted).

In other words, the ALJ explained why the opinions of disabling limitations were not well supported (i.e., they are based on one consulting examination, conducted before Mr. Staten was compliant with his medication) and are inconsistent with other evidence in the treatment record.

The ALJ then went further, discussing how Dr. Doyle's opinions are further inconsistent with Mr. Staten's activities of daily living:

> [H]e acknowledged that he can use public transportation and he can shave, feed himself, and use the toilet independently. He added that he does not need reminders to take his medications, he prepares meals daily, he can mow his yard, he goes outside twice daily, he can go out alone, and he can shop in stores for clothing and shoes. He further acknowledged that he can count change and handle bank accounts with the help from his wife, he enjoys watching television and playing video games, he spends time with others on a regular basis, and he can walk a mile. Overall, the claimant's treatment notes, and his activities of daily living indicate that he is more []able than [Dr. Doyle] opined.

(Tr. 30.)

It is true that the ALJ did not find a specific learning disorder to be a medically determinable impairment, but the ALJ explained that decision. Specifically, she noted that Mr. Staten had "self-reported" the condition, and there was no other evidence or testing in the record to confirm such a diagnosis. (Tr. 18.) I cannot find reversible error in the decision. The ALJ's conclusion is reasonable, and Mr. Staten does not suggest—let alone show—that he has any specific functional limitation stemming from the condition that is not accounted for in the RFC. Indeed, the ALJ specifically wrote that even if Mr. Staten had a learning disorder, "the limitations in the residual functional capacity would fully accommodate for such a condition." (*Id.*)

I further note that Mr. Staten has the burden of proof here, but his statements have been inconsistent. For example, he reported that both his parents were still living on October 11, 2023, saying that he speaks with them "every now and then" (Tr. 467), but then on October 17, 2023, he told the consultative examiner that his father had died in an alcohol-related accident. (Tr. 440.)

In any event, while Mr. Staten points to those areas of the record that he feels supports greater limitations, "reweighing evidence is not permitted at this stage of review." *Harcula v. Comm'r of Soc. Sec.*, No. 1:22-CV-01950-CEF 2023 WL 6050291, at *14 (N.D. Ohio) (citing *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 406 (6th Cir. 2018)). I find the ALJ's recitation of the evidence, and particularly her conclusion that Mr. Staten showed significant improvement on medication, to be materially accurate and reasonable. When Mr. Staten received his monthly aripiprazole injection in March 2024, he was medication compliant and "pleasant," with no hyperverbal appearance. (Tr. 489.) He reported for the first time since his release from incarceration that he was not drinking alcohol. (Tr. 490.) He was irritable in April 2024, but he again was not hyperverbal or displaying flights of ideas. (Tr. 488.) He was not as talkative in May

2024, but his cognitive function was intact, he was cooperative with the exam, his speech was clear and coherent, and his thought process was logical and goal directed. (Tr. 483.)

Even looking past the inconsistencies in Mr. Staten's reports, the record clearly provides substantial evidence to support the ALJ's reasoning and conclusions. As there is no basis for remand, I recommend that the Commissioner's decision be affirmed.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: August 17, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge,

> making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019)